[No. 19222.    Department Two.    September 18, 1925]

ANTON HEINRICH ALBERT, *Appellant*, v. ADOLPH MUNTER *et al., doing business as Munter & Munter, Respondents.*[1]

ATTORNEY AND CLIENT (41)—CONTRACTS FOR COMPENSATION—CONTINGENT FEES — VALIDITY — EVIDENCE — SUFFICIENCY. An attorney's contract for a contingent fee of 25 per cent of the amount recovered by suit from the alien enemy property custodian, involving a claim for $32,000, is reasonable and enforcible, where it appears the client was well informed, entered into it fairly and understandingly, after attempting to engage other attorneys for less, the case was presented with great ability and entire success and involved serious complications.

WAR—LEGISLATIVE CONFISCATION OF ENEMY PROPERTY—RESTORATION—LIMITATION OF ATTORNEY'S FEES. Section 20 of the Trading with the Enemy Act (Fed. Stat. Ann. 1918, Supp. p. 846; 40 Stat. L. 411) limiting attorney's fees to three per cent of the value of the money or property delivered to an agent or attorney under the act, does not apply to a recovery from the alien enemy property custodian, brought by one who was not an "enemy or ally of enemy," within the purview of the amendment of March 4, 1923, but was a citizen of the United States, wrongfully deprived of property to which he was entitled to full restoration.

Appeal from a judgment of the superior court for Spokane county, Carey, J., entered October 29, 1924, upon findings in favor of the defendants, in an action

[1]Reported in 239 Pac. 210.

to recover property held under a claim of lien for attorney's fees, tried to the court. Affirmed.

*J. W. Graves* and *Garrecht & Twohy,* for appellant.

*Powell & Herman,* for respondents.

Holcomb, J.—This suit was instituted by appellant to compel the return of bonds and other securities of the value of about $12,000, held by respondents under a claim of lien for an attorney and solicitors' fee of $8,187.98, alleged to be due them for securing the return by the Federal alien property custodian to appellant of property of the value of about $32,000 seized during the war. A trial to the court without a jury resulted in a judgment for respondents. Respondents claimed under a contract for attorneys' fees executed by appellant to them by which it was agreed that they should receive 25% of the amount recovered. The contract was not proposed nor entered into until some time after the employment had commenced, nor until suit had been brought by respondents for appellant against the alien property custodian, which later resulted in favor of appellant for the return of all the property seized.

Appellant attacked the contract on several grounds:

(1) That, under an existing Federal statute, the fee that could be recovered was limited to 3% of the value of the money or property recovered from the alien property custodian; judgment for which amount was tendered to respondents.

(2) That respondents, in order to secure the delivery of appellant's property to them by the alien property custodian, caused Adolph Munter, one of the respondents, to make representations by affidavit that no demand would be made nor amount received for services rendered in connection with such claim

in excess of 3%, and that respondents had, therefore, estopped themselves from claiming any amount in excess thereof.

(3) That, by reason of appellant's mental and physical condition at the time, and the stress of poverty and the dominance and urgency of respondents, the will and judgment of appellant were so overcome at the time of signing the contract as to render it void for duress and undue influence.

(4) That, by reason of the fact that the contract was entered into after the relation of attorney and client had commenced, respondents then occupied toward appellant a fiduciary relation which of itself rendered the contract void; in any event, voidable to the extent that only the value of the services could be recovered, regardless of the terms of the contract.

(5) That, by reason of the confidential and fiduciary relationship existing at the time the contract was made, respondents were required to advise appellant of all the facts and acquaint him with his rights under the law, and failure so to do was constructive fraud.

There are but two questions involved in this case, namely:

(1) Was the 25% contingent fee contract entered into fairly and understandingly by the parties?

(2) Does the 3% provision of § 20 of the Trading with the Enemy Act apply to this case?

Appellant was born in Germany and came to this country in 1878, when 23 or 24 years of age, and in 1879 came to Spokane county, this state. He has resided there, with the exception hereinafter noticed, ever since. He was naturalized in 1889. He was never married. He acquired land and farmed it, and by thrift and economy accumulated a small fortune, amounting to over $32,000 at the time of its seizure.

In 1913, having become afflicted with some eye trouble, he disposed of his real estate and deposited the proceeds in money and securities with the Spokane & Eastern Trust Company of Spokane, with power to invest and reinvest. His investments, when assembled and delivered to the alien property custodian, showed a wide range of selection. He held, besides a large amount of cash, investments ranging from North Dakota to Seattle, Washington. He had government bonds and municipal and public corporation securities and mortgages. Being desirous of securing treatment for his eye trouble and to visit Germany, in November, 1913, he went to Germany. He was there at the outbreak of the war in 1914. On his trip to Germany he lost his naturalization papers, and after determining to return to the United States he found difficulty in securing a passport or in establishing his citizenship. The war so interrupted communications between Germany and this country that he had difficulty in communicating with his agent about his property and other matters.

After we became involved in the war, appellant made a number of efforts to get back to this country, which failed. He also attempted to register in Germany as an American citizen, which was denied there. It seems that he was exceedingly anxious to return to the United States and that he made vigorous efforts, through agencies both at home and abroad, to be allowed to re-enter the United States. His correspondence shows that he declared that he "was not the cause of the war between the United States and Germany," and he seemed to think that ought to settle the matter and he be allowed to return. It did not seem to settle the matter, however, for it was necessary for him to continue to make vigorous and determined efforts until

1922.  He did not reach Spokane until January 2, 1923.

In 1917 Congress passed "The Trading with the Enemy Act" (Fed. Stat. Ann. 1918 Supp., p. 846; 40 Stat. L. 411), under the terms of which, because appellant was a resident within the territory including that occupied by the military and naval forces of the nation with which the United States was at war, he was included in the classification of an "enemy" or "ally of enemy," and his trustee and agent, the Spokane & Eastern Trust Company, was required, under the provisions of that act, to deliver the property of appellant to the alien property custodian.

Upon the cessation of hostilities, appellant renewed his application to be allowed to return to the United States.  He set forth in his application that he had been in Germany since 1913; that he had property interests in America; that he desired to return here, and if his health permitted would remain.  This application was denied by the department of state for the reason that, under the act of Congress of March 2, 1907, a presumption of expatriation arises where a person naturalized here returns to his native country and remains there for more than two years.  He was also advised that this presumption might be overcome by making a satisfactory showing that he had not intended to expatriate himself; that he had been detained abroad by sickness or other causes, or that it was impossible for him to return within the time stated.

In order to meet these requirements, he wrote to a brother living in this state, asking him to go to a notary public and secure affidavits to show his standing as a citizen, and that it was necessary for him to come on account of the situation of his property, and other information such as was suggested which might be helpful and useful in helping him to procure a pass-

port and secure the return of his property. The brother took the letter to Adolph Munter, with whom he was acquainted and whom he knew to be a notary public, who thereafter on behalf of respondents took up correspondence with appellant. In the course of their activities they sent a letter, in May, 1922, to appellant, asking him to execute a power of attorney before the American Consul, filling in either the name of his brother, Jasper Albert, or the name of Adolph Munter in the power, whichever he preferred; which power of attorney appellant executed in Germany in blank and returned to respondents, who, upon the refusal of the brother to act as attorney in fact, filled in the name of Adolph Munter. Respondents thereupon became active in their efforts to procure from the state department a ruling which would permit appellant to leave Germany and come to America. A great deal of correspondence occurred. The state department adhered to its decision for some time. Appellant enlisted the services in Germany of a notary public or attorney, and respondents enlisted the co-operation of Senator Poindexter; and after a time appellant was notified that, if he would apply to the American Consul at Berlin, he would be given papers upon which he could return to the United States. On account of the fact that he had lost his citizenship papers, a paper was granted to him as one "devoid of nationality." Appellant believed that, as soon as he arrived in Spokane, his property would be restored to him, and that all it would be necessary to do would be to write to the department in Washington, D. C., for it; which he immediately did. His efforts failed.

In March, 1923, respondents, knowing that, under the Trading with the Enemy Act, as amended by act of Congress of December 27, 1922 (U. S. Comp. Stat.,

1923 Supp., vol. 1, § 3115½e p. 1072), it would be neces-
sary to bring a suit in equity, as provided therein, for
the recovery of the property, advised appellant to
start suit. The original provision of the Trading with
the Enemy Act with reference to suits to recover such
property provided that they should be brought before
the expiration of six months after the cessation of
hostilities. By the act of December 27, 1922, *supra,*
the period of limitations was extended to thirty
months. An amendment passed December 21, 1921,
had extended it from six to eighteen months. An act
of March 4, 1923 (Fed. Stat. Ann. 1923 Supp., p. 118;
42 Stat. L. 1511), entirely removed the limitation. On
March 3, 1923, respondents instituted the action on be-
half of appellant in the United States district court
for the eastern district of Washington, at Spokane,
against the alien property custodian and the treasurer
of the United States as defendants, to recover all the
property.

The provision of the Trading with the Enemy Act,
under the amendment of December 27, 1922, under
which the suit was brought, reads as follows:

".   .   .   said claimant may, at any time before the
expiration of thirty months after the end of the war
institute a suit in equity in the Supreme Court of the
District of Columbia or in the district court of the
United States for the district in which such claimant
resides,   .   .   .   (to which suit the Alien Property
Custodian or the Treasurer of the United States, as
the case may be, shall be made a party defendant), to
establish the interest, right, title or debt so claimed,
.   .   ." (Act of Congress of Oct. 6, 1917, as amended
by act of Dec. 27, 1922, c. 13). [Fed. Stat. Ann. 1922
Supp., p. 311.]

This suit was handled entirely from Washington,
D. C., except that the United States district attorney
at Spokane tried it in the district court there. The

answer of the defendants in that suit was drawn in Washington, D. C. The suit was heard on its merits before the United States district court at Spokane on August 31, 1923. The court ordered a decree in favor of appellant for the return of all of the property. The district attorney for the eastern district of Washington was ordered, from Washington, D. C., to have all the testimony transcribed and sent back, so that the department might determine whether it would appeal. This was done, and some six weeks after receiving the transcript of the testimony the department informed the district attorney that no appeal would be taken. After some months, in April, 1924, all the property decreed to appellant was redelivered. Appellant, by the decree, secured money and property of the value of nearly $33,000.

It was about one and one-half months after that suit was started, and before the defendants in that suit had answered, that respondents called appellant into their law office and requested him to sign the contract agreeing to pay respondents 25% of any amounts they might recover. Under the contract, respondents were to get nothing if nothing was recovered for appellant. Appellant had no other money or property than that involved in that suit.

At first, appellant refused to sign the contract proposed, declaring the contingent fee requested to be excessive. He told respondents that he could get the same services for less. He was told to go and see other lawyers, which he did. He decided to consult the firm of Graves, Kizer & Graves, and went to their office, desiring to see Mr. Frank Graves of that firm. He was unable to see Mr. Graves, but did see and converse with Mr. Kizer of that firm at some length. He was in the office consulting him for half an hour or so.

He had with him one of the officers of the trust department of the Spokane & Eastern Trust Company, who introduced him to Mr. Kizer. Mr. Kizer interrogated him as to the facts and informed him that, under all the circumstances, he thought a contingent fee of 33⅓% of the amount recovered would be fair and reasonable. Whether he saw other attorneys in Spokane is not known, but three or four days later he returned to the office of respondents and signed the contract they proposed.

The testimony of appellant in court and his correspondence as shown in the record disclose that he is a man of great shrewdness, reads and writes English very well, and his financial transactions also show him to be a man of great business ability and not unlettered or unpracticed in business affairs at all. The evidence is, in fact, very convincing that appellant was amply able to take care of himself in ordinary transactions. It is true his entire fortune was involved and he was under great anxiety to recover it, but the evidence is ample to sustain the fact that he was not hurried nor harassed into the making of the contract, and that it was not proposed to him until after he had discovered for himself that he could not win back his property without the aid of skilled and competent attorneys. After hearing the witnesses and examining all the documentary evidence in the case, the court, among others, made the following findings of fact, among which is set out the contract in controversy:

"FINDING OF FACT No. 5.

"That during the year 1921 the plaintiff employed the defendants to perform various services for the purpose of securing a passport to permit plaintiff to return from Germany to the United States of America. That said employment eventually developed into and included the establishing of the status of the plaintiff

as a citizen of the United States and securing the return of the money and property which had been taken possession of by the Alien Property Custodian and Treasurer of the United States acting under authority of the 'Trading with the Enemy Act.'

"Finding of Fact No. 6.

"That prior to the employment of the defendants by plaintiff and while plaintiff was in Germany, the Department of State of the United States held that plaintiff had presumptively expatriated himself, and that plaintiff was no longer a citizen of the United States, that the Department of State twice reopened plaintiff's case after defendants were employed by plaintiff and defendants submitted on behalf of plaintiff on each occasion additional proof, but on March 3, 1923, the Department of State had not changed its ruling. That the defendants advised plaintiff to bring suit, among other grounds, upon the ground that the Statute of Limitations would run in the near future, that on March 3, 1923, the defendants, acting with the consent and under the authority of the plaintiff, as solicitors in equity, instituted a suit in equity, in the District Court of the United States for the Eastern District of Washington, Northern Division, for the establishment of plaintiff's status as a citizen of the United States and for the recovery of said seized property.

"Finding of Fact No. 7.

"That no agreement or contract had been made between plaintiff and the defendants, prior to April, 1923, as to the amount of compensation the defendants should receive for their services. That plaintiff had no money or property of any kind whatsoever except the claim for the return of said seized property.

"Finding of Fact No. 8.

"That three or four days prior to April 18, 1923, the defendants discussed with plaintiff the amount of their compensation and presented to plaintiff and asked him to sign a contract and agreement which was in words and figures as follows, to-wit:

" 'AGREEMENT OF EMPLOYMENT.

" 'THIS AGREEMENT MADE AND ENTERED INTO between ANTON HEINRICH ALBERT, party of the first party, and MUNTER AND MUNTER, party of the second part,

" 'WITNESSETH, that whereas the said party of the first part has heretofore employed the second parties to collect by suit or otherwise, moneys and property claimed to be due to said first party from the alien property custodian of the United States, and whereas the said second parties in pursuance thereof have heretofore rendered services necessary in the premises and commenced an action for said first party in the District Court of the United States for the Eastern District of Washington against Thomas W. Miller, Alien Property Custodian, and Frank White, Treasurer of the United States;

" 'Now THEREFORE, the said first party agrees to pay to said second parties in full compensation for services heretofore rendered and for those hereinafter to be rendered, in said action now pending, a sum of money equal to one-fourth (¼) of all moneys and property which may be recovered in said action or at all of the moneys and other property which are now in the possession of the defendants in the aforedescribed action.

" 'The said parties of the second part accept said employment and on the terms aforesaid and agree to make no charge whatever for their services if no recovery be had by suit or otherwise.

" 'IT IS UNDERSTOOD between the parties hereto that the above compensation provided for shall be in full of all services heretofore rendered by the parties of the second part and for all services which shall hereafter be rendered by the parties of the second part, including appearances in any appellate courts to which the present action may be taken.

" 'IN WITNESS WHEREOF the said parties have hereunto and a duplicate hereof set their hands this 18th day of April, 1923.'

"That on said April 18, 1923, the said agreement was executed by the parties hereto and that said con-

tract and the negotiations regarding same were free from any fraud, duress or bad faith.

## "FINDING OF FACT No. 9.

"That the defendants prosecuted said litigation and said suit in equity resulted in the entry of a decree and supplemental decree which established the status of the plaintiff as a citizen of the United States of America and directed the return to him of the property which had been seized and the proceeds thereof.

## "FINDING OF FACT No. 11.

"That the defendants paid out and advanced to plaintiff and for his benefit the sum of $101.54, in connection with said employment and services, which amount is due and unpaid. That the net value of the property and money the return of which was secured through the services of defendants was the sum of $32,-749.93, and that the sum of $8,187.48 is due defendants for services under the terms of said contract, making the total amount due defendants the sum of $8,289.02. The defendants also have in their possession the sum of $179.09 interest collected on bonds since the bonds came into defendants' possession."

The findings were well sustained by a clear preponderance of the evidence.

Nevertheless it is true that, even in a jurisdiction where attorneys and parties are authorized by statute to make contracts for compensation of the attorneys during the existence of the relation of attorney and client, the contract may be considered void, or voidable, until it is shown by the attorney that the contract with his client was fair and reasonable, free from undue influence, and made after a fair and full disclosure of the facts upon which it is predicated. *In re Howell,* 215 N. Y. 466, 109 N. E. 572, Ann. Cas. 1917A 527, and editorial notes beginning at page 531; *Beck v. Boucher,* 114 Wash. 574, 195 Pac. 996.

In the last cited case, this court held that an agreement for contingent attorney's fees, entered into without fraud or misrepresentation, is not void as against public policy, since we have a statute (cited in the decision) authorizing such contracts, and that a client who permits an attorney to spend time and money under a contract for a contingent fee, and accepts the benefits of the contract, is estopped to assert its invalidity on the ground that it was solicited and that it was against public policy.

In this case, as the lower court found, and on the whole record, we have no doubt whatever that the contract in question was entered into fairly and understandingly, was acted upon by respondents with great skill, energy and fidelity, that their services were multifarious and valuable, that they could not have foreseen the ultimate result of their activities in behalf of appellant, and that a contingent contract for their attorney's fee on his and their part was almost unavoidable. We are, therefore, well satisfied to sustain the findings of the trial court as to the reasonableness, good faith and enforcibility generally of the contract.

A more difficult question arises upon the Federal statute limiting fees for the recovery of certain moneys and property from the alien property custodian to 3% of the amount of the recovery.

The statute, as has been said, is a part of the amendment to the Trading with the Enemy act of March 4, 1923. That act amended § 9 of the original act, which had theretofore been amended also so as to provide for the recovery by any person, not an enemy or ally of enemy, of any money or other property which may have been conveyed, transferred, assigned, delivered or paid to the alien property custodian, or seized by him and held by him or by the treasurer of the United

States; it was also provided that if the repayment, reconveyance, assignment or delivery of such money or property to the claimant was not ordered by the alien property custodian or by the treasurer of the United States or by the President, within sixty days after such application shall have been made, the claimant might institute a suit in equity in the supreme court of the District of Columbia, or in the district court of the United States for the district in which the claimant resides, to which the alien property custodian or the treasurer of the United States should be made defendants, to establish the interest, right, title or debt so claimed, and if so established the court should order payment, conveyance, transfer, assignment or delivery of the money or property so held by the alien property custodian, or the treasurer of the United States, to the claimant. It will be observed that § 9 of the amendment to the Trading with the Enemy Act of 1923 provided for the recovery of property of a person not an enemy or ally of enemy.

There were then added certain new sections to the Trading with the Enemy Act, among which was § 20, which provided as follows:

"That no money or other property shall be paid, conveyed, transferred, assigned, or delivered under this Act to any agent, attorney, or representative of any person entitled thereto, unless satisfactory evidence is furnished the President or the court, as the case may be, that the fee of such agent, attorney, or representative for services in connection therewith does not exceed 3 per centum of the value of such money or other property; but nothing in this section shall be construed as fixing such fees at 3 per centum of the value of such money or other property, such 3 per centum being fixed only as the maximum fee that may be allowed or accepted for such services. Any person accepting any fee in excess of such 3 per centum

shall, upon conviction thereof, be punished etc.'' Fed.
Stat. Ann. 1923 Supp., p. 123.

A new section, numbered 21, was also added:

"That the claim of any naturalized American citizen under the provisions of this Act shall not be denied on the ground of any presumption of expatriation which has arisen against him, under the second sentence of section 2 of the Act entitled 'An Act in reference to the expatriation of citizens and their protection abroad,' approved March 2, 1907, if he shall give satisfactory evidence to the President, or the court, as the case may be, of his uninterrupted loyalty to the United States during his absence, and that he has returned to the United States, or that he, although desiring to return, has been prevented from so returning by circumstances beyond his control.'' Fed. Stat. Ann. 1923 Supp., p. 123.

There was also included in the amendment to § 9 of the Trading with the Enemy Act of March 4, 1923, a provision respecting the recovery by subjects of nations with which we had been at war, providing as follows:

"(b) In respect of all money or other property conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States, if the President shall determine that the owner thereof at the time such money or other property was required to be so conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or at the time when it was voluntarily delivered to him or was seized by him was—

"(1) A citizen or subject of any nation or State or free city other than Germany or Austria or Hungary or Austria-Hungary, and is at the time of the return of such money or other property hereunder a citizen or subject of any such nation or State or free city;
.  .  .'' Fed. Stat. Ann. 1923 Supp., p. 119.

Then follows a long category of other persons, associations, incorporations and bodies brought under the

same terms of the act, and in subdivision 9 it is provided that:

"(9)   An individual who was at such time a citizen or subject of Germany, Austria, Hungary, or Austria-Hungary, or who is not a citizen or subject of any nation, State, or free city, and that such money or other property, or the proceeds thereof, if the same has been converted, does not exceed in value the sum of $10,000, or although exceeding in value the sum of $10,000 is nevertheless susceptible of division, and the part thereof to be returned hereunder does not exceed in value the sum of $10,000: -  .  .  ."  Fed. Stat. Ann. 1923 Supp., p. 120.

These provisions were followed in this amendment by provisions that the President might order the return by the alien property custodian or the treasurer of the United States, upon the application therefor for the allowance of such claim of any such alien, as enumerated, such money or property up to $10,000 in value.

Another provision of the foregoing amendment limited its application to "claimants other than citizens of the United States."

Appellant insists that the limitations contained in § 20 of the amendment of 1923 apply to all recoveries under the Trading with the Enemy Act. The alien property custodian and the law officer of the Department of Justice having authority in the alien property custodian's department so construed the act in this particular case, and held that the respondents were not entitled to recover or receive anything but the 3 per centum of the amount returned by the alien property custodian to appellant.

Appellant relies largely upon the case of *Calhoun v. Massie*, 253 U. S. 170.

That case arose under the Omnibus Claims Act of March 4, 1915, which made appropriations for the pay-

ment of 1,115 claims arising out of the Civil War which had, from time to time, been referred to the Court of Claims for investigation and established by that court as valid claims. That was a special act referring to a special group of claims which it was optional for the government to pay at all, and if it paid could pay upon any terms it saw fit. Calhoun had represented Massie for a number of years in pressing his claims against the government for property destroyed. Calhoun obtained a contract from Massie in 1911, prior to the passage of the Federal statute, whereby Massie bound himself to pay as a fee for Calhoun's services a sum equal to 50 per cent of the amount which might be collected, the fee to be a lien upon any warrant, etc. Calhoun performed his part of the contract and in strict accordance with it. When Congress passed the appropriation bill, cited *supra,* appropriating funds to pay Massie $1,900 and others various sums, there was a clause added to the law providing:

"That no part of the amount of any item appropriated in this bill in excess of twenty percentum thereof shall be paid or delivered to or received by any agent or agents, attorney or attorneys on account of services rendered or advances made in connection with said claim.

"It shall be unlawful for any agent or agents, attorney or attorneys to exact, collect, withhold or receive any sum which in the aggregate exceeds twenty percentum of the amount of any item appropriated in this bill on account of services rendered or advances made in connection with said claim, any contract to the contrary notwithstanding. . . ."

The supreme court decided, by a five-to-four decision, that, notwithstanding the 5th amendment guaranteeing the liberty of contract, the legislation was a valid exercise of the power of Congress to appropriate money upon any terms and conditions it saw fit, where there

would be no right of recovery, or where no right of re-
covery existed without the act of Congress when the
contract was made and dependent for its recognition
on the action of Congress in making the appropriation.

We can see no likeness between that case and this.
There the attorney, while he had a contract lawful in
all other respects, was dealing with a matter which he
knew would depend upon the conditions of the act of
Congress appropriating money to his client. Even in
that case, Mr. Justice McReynolds wrote a very strong
dissenting opinion citing authorities directly opposed
to the decision in the cited case, and particularly one
just a year before (*Capital Trust Co. v. Calhoun*, 250
U. S. 208), in which the same attorney was involved,
which held in another like case that, although the at-
torney could not recover out of the fund appropriated
for the payment of a claim against the United States,
there was nothing to prevent him from recovering from
any other assets or estate of his client not out of the
moneys received from the United States, and reversing
the judgment of the court of appeals of Kentucky, but
remanded it with the right to recover from any other
property or estate of the client. The dissenting opin-
ion closed with this language:

"The Fifth Amendment was intended to protect the
individual against arbitrary exercise of Federal power.
It declares, no person shall be deprived of life, liberty
or property, without due process of law; and this in-
hibition protects every man in his right to engage in
honest and useful work for compensation." (citing
authorities)

While, of course, the dissenting opinion cannot pre-
vail against the majority opinion in the *Massie* case,
*supra,* the reasoning applies particularly to this case,
because Congress was without power to prevent any

citizen of the United States from bringing any appropriate action, where the court had jurisdiction, to recover his own property from any unjustifiable possession thereof.   True, under the situation shown in this case, appellant, while sojourning in Germany, an enemy country of the United States with which we were at war, was classed as an enemy, and, under the act of March 2, 1907, was presumed to be an expatriate. When he was able to re-establish his citizenship, he did so.   He did so largely through the skill and activity of respondents.   When his citizenship was *not restored,* but recognized, he was allowed re-entry into the United States.   True, also, permission through an act of Congress was necessary to bring an action against the government or its custodial officer, for restoration of property seized as an act of war.   He was not an "enemy or ally of enemy" within the purview of the first provisions of the amendment of March 4, 1923, to the Trading with the Enemy Act.   As a citizen, he was entitled to the protection of all the constitutional provisions thrown about him to prevent his property being unjustly confiscated and to cause it to be restored to him.   He brought suit in the court provided for that purpose by the Federal statutes.   He did so through respondents as his attorneys and solicitors.   The court having jurisdiction thereof decided that he was a citizen of the United States entitled to the protection of its laws, that the property in question was not the property of an enemy or ally of enemy, but was the property of a citizen of the United States, and that he was entitled to its restoration in full.   It was so restored to him through the efforts of respondents as attorneys and solicitors, and not as agents, representatives or attorneys in fact of an enemy or ally of enemy entitled to receive back, through the magnanimity of

our government, $10,000 of enemy-owned property from the United States.

Congress had the right to prevent appellant from using his property in aid of the enemy during the war, and did so under the Trading with the Enemy Act. When hostilities ceased and appellant was restored to his constitutional rights, he was entitled to his property under the provisions of § 9 of the Trading with the Enemy Act, as amended by the act of March 4, 1923, § 1, heretofore outlined, and not under the provisions of the new § 20. He had the constitutional right to make, when freely made, any reasonable contract for the services of attorneys and solicitors to establish his citizenship and his property rights. It may be added, in passing, that there is a Federal statute permitting agreement between the parties for reasonable compensation to be charged by attorneys, solicitors and proctors in the courts of the United States, 2 U. S. Comp. Stat., § 1375.

We are satisfied that the judgment of the trial court was right and should be affirmed.

It is so ordered.

TOLMAN, C. J., FULLERTON, MACKINTOSH, and MITCHELL, JJ., concur.